## BANKSTON v. SCOTT et al.
### No. 12034.

Court of Civil Appeals of Texas. Galveston.
Dec. 23, 1948.

Rehearing Denied Jan. 13, 1949.

Robt. B. Keenan, of Gladewater, M. E. Gates, of Huntsville, and Fulbright, Crooker, Freeman & Bates and M. S. McCorquodale, both of Houston, for appellant.

Gordon M. Burns and J. G. Davis, both of Huntsville, and B. L. Collins, of Lufkin, for appellees.

CODY, Justice.

On December 8, 1946, the County Court of Walker County, sitting in matters probate, ordered Alex Scott, administrator, with the will annexed, of the estate of W. T. (Tom) Bankston, deceased, to deliver to appellee Sadie Bailes certain securities totalling in value the sum of $14,496.00, which securities were deposited in two Huntsville banks. Thereupon, in proper time, appellant, Isla Loyd Bankston, alleging that she was the wife of Tom Bankston, deceased, appealed to the District Court of Walker County, where she filed her petition attacking the order which directed the delivery to appellee Sadie Bailes of the aforesaid property of the value, as aforesaid, of $14,496.00.

The appellees filed a plea in abatement to appellant's petition, and a motion to dismiss the appeal to the district court, upon the ground that appellant was not the wife of Tom Bankston, deceased, and had no interest in his estate, etc.; and, subject to said plea and motion, answered appellant's petition. The court announced that he would take the plea in abatement, and the motion to dismiss, along with the case. At the conclusion of the evidence, appellant moved for a directed verdict, which motion was by the court overruled. The case was submitted to the jury upon a single special issue, and in answering said special issue the jury found that, at the time of the death of the deceased, on the 22nd of November, 1946, appellant was not the lawful wife of said deceased.

Then, on February 23, 1948, the court entered judgment on the jury's said verdict, sustaining appellees' plea in abatement, and dismissed the appeal. Thereafter, on February 27, 1948, appellant filed her motion for judgment notwithstanding the verdict, which was refused, and thereafter her motion for new trial was filed, presented and refused.

Appellant predicates her appeal upon four points, the first two of which are to the effect that the court should have found that the evidence established, as a matter of law, that appellant and the deceased were married at the date of his death, and said points 1 and 2 are stated by appellant substantially as follows:

I. The evidence having conclusively established a ceremonial marriage, the fact that the parties agreed to keep the marriage a secret, and live apart, and the further fact that appellant transacted her business in her maiden name cannot have the effect of impairing the marriage status which was so conclusively proved to exist.

II. The fact that appellant was unable to produce the official record of her marriage does not refute the evidence that such marriage was consummated, as shown by a witness to the ceremony.

Appellant relies solely upon the evidence which she produced upon the trial of a ceremonial marriage performed at Chamblee, Georgia, in 1918, to establish the existence of a marriage between herself and Tom Bankston, at the date of his death.

Tom Bankston died on November 22, 1946. He left securities worth in excess of $30,000.00. He had been employed at the State Prison at Huntsville. And he was in the first World War. The evidence produced by appellant was that while he was stationed at Camp Gordon, near Chamblee, Georgia, the marriage in question took place. Her testimony at the trial was to the effect: That at the time she was about 16 years of age, and lived in DeKalb, Texas, a town of a thousand inhabitants. That she left DeKalb in a Ford, which belonged to the deceased, on a Thursday or a Friday, and drove to Texarkana where she met Art Shaver, who was then about 29 years old and married, and was driven by him to Chamblee, Georgia, in order to marry Tom Bankston. That they did not arrive at Chamblee until Monday or Tuesday of the following week. That she and Shaver sometimes spent the night in the automobile, and sometimes in a farmer's house. That she was married to Tom Bankston in the first week in April, 1918, by a Justice of the Peace, that Tom Bankston obtained the marriage license, and she saw it. That the only witnesses present were Art Shaver and Dr. Beck, a Texas State Senator, who had been dead for some years prior to the trial. That she lived in Chamblee, a village of about 200 people, as Mrs. Tom Bankston for about two weeks.

█ The testimony of Art Shaver corroborated that of appellant in all material respects with respect to the trip and the marriage ceremony. If this testimony, and that of appellant, were uncontradicted, it would then become our duty to examine it more carefully and at greater length to determine whether or not their evidence compelled a verdict to the effect that the ceremonial marriage took place. But their evidence was not uncontradicted, and the issue of their credibility as against that of the witnesses produced by appellees was an issue before the jury. Also there were unusual circumstances.

W. J. Bankston, a witness for appellees, and a brother of the deceased, testified that he talked to appellant over long distance telephone from Huntsville, where Tom lived, and where he died, three days after Tom's death, at which time he told appellant that he had not seen Tom's will. That appellant then told him that she knew that there was no will because when she last saw Tom he wanted to make a will for her, but since they were not married, she would not let him do so; that she had known Tom for many years, and had been good friends all those years.

Mrs. W. J. Bankston testified for appellees that on November 25, 1946 (three days after Tom's death) she had talked from Dallas over long distance telephone to appellant, and that appellant told her that she was a good friend of the family. Said witness further testified that the first

time she ever saw Tom (the deceased) was about fifteen years before the trial, when Tom was working at the prison. In response to her question, Tom told her that he had never married because the only girl he ever asked had left him waiting at the doorsteps.

Both Mr. and Mrs. W. J. Bankston admitted that appellant told them when they saw her the next day that she had married Tom in Georgia in 1918. But at that time she stated that it was Dr. Beck who had driven her over to Chamblee, and had obtained the marriage license.

Appellant herself admitted that when she came to Huntsville, the Saturday after Tom's death, and met appellee Sadie Bailes, that she told said appellee she was "just a friend of the family."

The evidence showed that appellant conducted a trucking business, a cafe business, and dealt in real estate. That she had engaged in litigation, and that on many occasions she had sworn she was a feme sole, and that she so made out her income tax returns. That she and Tom had decided to keep their marriage secret because her brother-in-law, Durst, and her sister, the wife of the said Durst, did not approve of Tom. That the marriage was kept a secret from her father and mother, and all of her five sisters, but that her brother knew that she and Tom lived as man and wife in the home of Mr. and Mrs. Durst in DeKalb, Texas, for some months while the Dursts were absent in Oklahoma, but that they ceased to do so before the Dursts returned. They continued to keep the secret after the death of the Dursts.

The evidence showed that the parties had corresponded through the years, beginning when Tom was in the military service. The last letter was dated November 11, 1946, less than two weeks before his death. It concluded with these words: " * * * Honey I want to tell you again that I enjoyed your visit lots and lots and lots. Oh yes [here a line is deleted] to come [deletion] up. Thank you again. Well Hone I'll run down and mail this now. Good Nite Precious I love you." Signed "Tom". Another letter was dated 10/25/46, and is addressed to appellant as "Dearest Isla", and is signed, "Your Husband, Tom." The letter just prior to that is addressed "Sweetheart", and signed "Your Sweet Daddy, Tom." In that letter, he stated that earlier in the .night he had cancelled a long distance call to her because she could not be reached, and commented that the telephone operator had told him that it looked like his girl had a date, and not with him, didn't it? Then, quoting from the letter "Honey do you have a Boy friend there I hope not. I don't have any Girl here. Now am I selfish about you, cause I love you. Good Nite Dear. I love you. Your Sweet Daddy, Tom." We noted two other letters written in the year 1946 which were subscribed "Your Sweet Daddy, Tom."

If the evidence had conclusively established that appellant and Tom Bankston had married by a ceremonial marriage in 1918, it would follow that it could only have been dissolved by death or by the decree of a court of competent jurisdiction. The fact that appellant could not produce any official record of the marriage, or the facts that she lived apart from Tom, and engaged in business as a feme sole, and, whenever the occasion arose to declare her status, always swore she was single, could not sever the marriage. See DeBeque v. Lignon, Tex.Com.App., 292 S.W. 157; Shepard v. Shepard, Tex.Civ.App., 139 S. W.2d 195. But it can hardly be denied that where a woman lives as a feme sole all her life, conducts her business as a feme sole, and swears that she is a feme sole, the same constitutes at least some evidence that she is what she has so represented herself to be for almost a generation. Indeed, we know of no rule of law that would require a jury to give more credence to her evidence that she had been married to Tom Bankston by a ceremonial marriage in 1918, than to her conduct and oaths over practically the entire period since the date of the claimed marriage. It was for the jury to determine whether she was telling the truth, or appellees were telling the truth as to what she said to Mr. and Mrs. Bankston, the brother and sister-in-law of the deceased, after Tom's death to the ef-

**294**

fect that she was not married to Tom Bankston. And appellant admitted she told appellee Sadie Bailes, after Tom's death, that she was just a friend of the family.

Appellant came forward only after Tom Bankston's death, and after he was known to have left considerable property, with the story that she was married to Tom, and had been married to him for 28 years. Tom was then dead, and his mouth was closed. But he had told his sister-in-law, when he met her for the first time some 15 years before the trial, but long after 1918, that he had never married and his reason for never having married. It is true that in one of his letters to appellant he had subscribed himself as her husband. But by merely subscribing himself as appellant's husband, he did not make himself such. At most, the act of subscribing himself as appellant's husband to a single letter merely tends to support appellant's evidence that the parties married secretly, at a place far removed from where the parties lived. He also subscribed himself as appellant's Sweet Daddy. That was manifestly a mere term of endearment, and not one asserting paternity. In a letter subscribed as Sweet Daddy, the deceased assumed that she had the right to have a boy friend, and that she sustained no relationship which could be an impediment to having such friends.

The jury observed the parties and the witnesses when they testified. Under the evidence, the credibility of the parties and witnesses was an issue in this case. Had the jury determined that the deceased was the husband of appellant, such determination would have been binding on this court. Their determination of this issue adversely to appellant is equally binding. No purpose would be served in citing authority in support of so elementary a point of law.

Appellant's remaining two points relate (a) to the right of appellee Sadie Bailes to take title to securities which stood in the deceased's name at the time of his death, and which had not been delivered to her during the life of the deceased, and (b) to the jurisdiction of the probate court to determine title to property whose value exceeds $1,000.00. We do not understand that appellant claims any right to have these points passed on should it be determined that the jury's finding, that she was not the wife of deceased, was binding. Since we have held that the jury's finding is binding, it would be improper for us to determine at appellant's suit, whether title to the securities passed to Sadie Bailes.

We affirm the judgment.