### In re GALEN'S ESTATE.

County Judge's Court, Dade County.

December 21, 1953.

Garland M. Budd, Miami, for the petitioner.

Darrey A. Davis of Sibley & Davis, Miami Beach, for the executrix.

FRANK B. DOWLING, County Judge.

This matter came on for hearing and trial before the court upon the election to take dower and petition for assignment of dower filed herein by Anne Holding and the traverse and response thereto filed by A. Regina Galen Chilton, individually and as executrix of the last will and testament of Daniel P. Galen, deceased. The court heard and considered the testimony adduced, read and considered the documentary evidence, heard and considered arguments of counsel, and read and considered the briefs submitted. In consideration thereof, the court finds as follows—

Daniel P. Galen died at Miami Beach on April 6, 1951 leaving a last will and testament (executed under date of March 15, 1951) wherein he devised and bequeathed all his estate and property to his sister A. Regina Galen Chilton and named her as executrix. On October 4, 1951 Anne Holding filed an election to take dower, alleging that she and Galen were married to each other on June 26, 1947. Thereafter on March 27, 1952 Anne Holding filed a petition for assignment of dower wherein she alleged that she was the widow of Daniel P. Galen by virtue of marriage to him on or about June

26, 1947. A. Regina Galen Chilton, individually and as executrix of the last will and testament of Daniel P. Galen, deceased, by traverse and response to such election to take dower and petition for assignment of dower, denied that Anne Holding was the widow of the deceased, and denied that she was entitled to dower in his estate and property.

The primary question here presented turns on the fact whether or not Anne Holding was or became the common law wife of Daniel P. Galen during his life.

One who asserts the illegality of a marriage must assume the burden of proof of such assertion. Lambrose v. Topham (Fla.), 55 So. 2d 557; LeBlanc v. Yawn (Fla.), 126 So. 789. One who asserts a common law marriage has the duty of proceeding to make prima facie proof of marriage, and the burden rests upon anyone disputing the marriage to disprove the existence of the marriage, or prove the illegality or non-existence of it. Caretta v. Caretta (Fla.), 58 So. 2d 439.

A common law marriage, or marriage per verba de praesenti, or consensual marriage may be shown in various ways. It may be established by testimony showing that the parties mutually agreed to take each other as man and wife; or it may be established by what is termed habit or repute, that is, proof of general repute and cohabitation as man and wife will support a presumption of marriage when the agreement of the parties cannot be shown. LeBlanc v. Yawn, supra.

In the instant controversy, general repute and cohabitation were relied upon to raise the presumption and make a prima facie proof of marriage. No mutual agreement between the parties to take each other as man and wife was shown. When habit or repute is relied upon, it must be supported by positive proof that it is generally understood among the neighbors and acquaintances in the community and with whom the parties associate in their daily lives that they are living together as man and wife, and that their relations are not meretricious. A mere sojourn, visit, or living together for a time will not support the common law marriage relation. Edge v. Rynearson (Fla.), 145 So. 180.

During his life the deceased, Daniel P. Galen, was an attorney at law. He served for many years as municipal judge for the city of Miami Beach. He was a long-time resident of Miami Beach, and was well known in that community. His friends, acquaintances and associates uniformly testified before this court that he was known

and reputed to be a confirmed bachelor in the community and among his closest friends and acquaintances. The testimony and evidence submitted on petitioner's behalf falls far short of showing any general understanding among their neighbors and acquaintances in the community that they lived together as man and wife. The testimony and evidence submitted on behalf of the respondent (who did not testify) negatives the existence of a common law marriage, and carried the burden of proving the non-existence of a marriage, and rebutted any presumption of marriage.

At the time of his death Galen was 58 years old. The petitioner was 35 years old. There was a difference of 23 years in their ages. Anne Holding moved to Miami Beach from Detroit on January 2, 1947. She first became acquainted with the deceased during February 1947 on an occasion when she consulted him professionally. She had been married to a Dr. Holding, and had a son as the result of that marriage. An exemplified copy of the proceedings had in a suit brought by Richard C. Holding against Anne G. Holding in the circuit court of Wayne County, Michigan was admitted in evidence herein. This suit concerned itself with the marital affairs of petitioner and her former husband. The controversy covered and extended over a period of time subsequent to June 26, 1947 (the date of the alleged common law marriage). The petitioner filed in such cause on September 28, 1950 an "Answer to Dr. Holding's Financial Statement." Such litigation shows that Anne Holding represented herself to the Michigan court as a single woman. Her pleadings and action therein were inconsistent with and repugnant to the existence of a common law marriage to Galen.

On October 15, 1947 (less than four months after the date of the alleged common law marriage) Anne Holding opened a brokerage account with Merrill, Lynch, Pierce, Fenner & Beane, 350 Lincoln Road, Miami Beach, and stated in the application required in connection with opening such brokerage account that she was unmarried. This account was maintained continuously to the time of the hearing, and no change was ever made to indicate any change in her marital status (respondent's exhibit #10).

The 1949 city directory for the greater Miami area lists Daniel P. Galen and shows his address as 335 West 47th St., Miami Beach. Such listing does not indicate that he was married. The same city directory also lists Anne Holding and shows her address as 1501 Alton Road, Miami Beach. The listing does not indicate that she was married. The 1947 city directory does not list the petitioner. It does list the deceased and shows the same information contained in the 1949 directory.

The petitioner enrolled in the LaFrance Beauty School on October 21, 1947 (almost four months after the alleged common law marriage). She completed her training there on June 1, 1948. She represented in her enrollment application that she was unmarried (respondent's exhibit # 18). The petitioner enrolled for certain classes at the University of Miami after the date of the alleged marriage and in her petition for admission represented that she was unmarried.

After the date of the alleged common law marriage (June 26, 1947) Galen executed a number of warranty deeds, contracts and leases covering real property owned by him. In each of these instruments he stated that he was a single man and caused his signatures to be acknowledged as such. The dates of execution or acknowledgment of these instruments are as follows—January 9, 1948, December 31, 1948, June 25, 1949, January 10, 1950, October 10, 1950 and November 15, 1950 (respondent's exhibits 4, 5, 6, 7 8 and 11).

The photostated, certified copy of the death certificate of Daniel P. Galen admitted into evidence as respondent's exhibit No. 9 shows him as a single man at the time of death.

At the time of Galen's death his sister, A. Regina Galen Chilton, had come to Dade County to be in attendance upon her brother during his last illness, and resided at the home of Dr. Bowman, where Galen was then residing, and under Dr. Bowman's care.

In determining the marital status of Daniel P. Galen and Anne Holding the court considers it significant that at the time of his death A. Regina Galen Chilton, the sister, took over all details and arrangements for the funeral service, the closing of his apartment, and in fact every detail usually attended to by the surviving spouse in the absence of adult children. An even more significant incident is the fact that while Galen's body was in the funeral home prior to burial Mrs. Anne Holding and her sister, Miss Mary Jude Genik, went to the funeral home along with many other of Galen's friends and acquaintances and there Mrs. Holding and her said sister registered on the "Register of Friends" her presence as "Mrs. Anne Holding," said Register of Friends containing the signatures aforesaid having been admitted in evidence as respondent's exhibit # 2 herein.

It is inconceivable to the court that the wife and surviving spouse of the decedent could have gone to the funeral home to view the body of her husband and registered in her name of "Anne Holding" as a friend of the deceased if she was in fact at the time Ann Holding Galen and his surviving spouse. Such an act is entirely contrary to all human conduct and emotion.

In fact the record does not show any occasion upon which she ever signed her name or referred to herself as Mrs. Galen until she filed her election to take dower and petitioned for assignment of dower in these proceedings.

From January 1944 until March 1951 the deceased from time to time purchased some 88 United States Savings Bonds. He caused each of these bonds to be made payable to the order of "Daniel P. Galen POD to Regina Galen Chilton."

The last will and testament of Daniel P. Galen admitted to probate in these proceedings was executed by him on March 15, 1951. Such will was virtually identical to a prior will executed on December 6, 1945. It would seem significant that by virtual re-execution of his previous will after his association with the petitioner, the deceased indicated, by implication at least, his intention and belief that his relationship with the petitioner was other than that of man and wife.

The income tax returns filed by the deceased for the years 1947 through 1950 represent that his status was that of a single man.

If the parties or either of them have denied a marriage or admitted that none existed, or otherwise made declarations repugnant to the existence of a marriage, these statements may be considered as tending to disprove a marriage, although they are not conclusive. Bankston v. Scott (Ct. Civ. App. Texas), 216 S.W. 2d 291; Henry v. McNealey (Colo.), 50 Pac. 37. Matters generally considered as evidence tending to disprove a common law marriage are the fact that proper records or memoranda are silent as to the marriage; that the woman did not assume the man's name; that the alleged marriage was kept secret; that the marriage was asserted for the first time after the death of one of the parties; that there was delay in asserting the marriage after the death of one of the parties. 55 C.J.S., Marriage, section 45, page 905.

Galen died of cancer of the lungs. The petitioner accompanied him when he went to the Mayo Clinic for examination and treatment. Upon his return, he lived in her apartment and she attended him. He moved out of her apartment, however, approximately two months prior to his death, and resided in the home of Dr. Robert N. Bowman until his death. The petitioner was aware of the nature of his illness and the imminence of his death. She asked the deceased to marry her, and endeavored to get his friends to persuade him to marry her. He declined, stating that no one would want to marry a sick man. Such conduct was inconsistent with the status of man and wife.

For some time prior to the alleged marriage until the time of his death Galen maintained an apartment at 335 West 47th St., Miami Beach. At the time of his death the majority of his clothing and personal effects were located in that apartment. The petitioner always maintained an apartment at various addresses as the place of residence for herself and her son. No constant or habitual cohabitation between the parties is shown. She always rented and paid for the apartment where she maintained her place of residence. Even her landlady was unaware of any cohabitation with the deceased. The deceased rented and maintained a separate place of residence throughout the entire period of time from the date of the alleged common law marriage until his death. Their cohabitation was spasmodic, temporary and occasional. The petitioner claims that the common law marriage extended over a period of almost four years. If her contention is true, it was a well-kept secret. Their conduct toward each other, toward their friends, neighbors, relatives and acquaintances, and their relations toward each other as exemplified by written documents executed by them respectively, clearly establish a relationship entirely foreign and repugnant to that of man and wife.

Where cohabitation and repute are relied on to show a common law marriage, the cohabitation must be professedly as husband and wife and public, so that by their conduct with each other the parties may be known as husband and wife. Something more than a secret or undisclosed private agreement must be shown to establish a common law marriage, because the state is a party to every such agreement, and it must necessarily be of a public nature. It is not a sojourn, nor a habit of visiting nor even remaining for a time. None of these fall with the true idea of cohabitation as a fact presumptive of marriage. To cohabit is to live and dwell together, to have the same habitation, so that where one lives and dwells, there the other lives and dwells. By general reputation and repute is meant the understanding among the neighbors and acquaintances with whom the parties associate in their daily lives that they are living together as husband and wife. It is necessary that there be evidence of cohabitation and reputation before a common law marriage may be presumed. Proof of one alone is not sufficient to sustain the presumption. Catlett v. Chestnut (Fla.), 146 So. 241, 91 A.L.R. 212; Klipfel v. Klipfel (Colo.), 92 Pac. 26, 124 Amer. St. Rep. 96; Maryland v. Baldwin, 112 U.S. 490, 5 Sup. Ct. 278, 28 L. ed. 822; Wigmore on Evidence, 3rd ed., vol. 7, section 2083, page 427.

Petitioner and her sister, Mary Genik, apparently were very close in their personal relationship. It is shown that in Detroit

Mary Genik lived with the petitioner at petitioner's home, and such relationship existed at the time of the alleged married between petitioner and Galen. The record discloses that there were no confidences exchanged between the petitioner and her sister as to the nature of the marriage, where it took place, who officiated, who was present, and there is a total lack of all the intimacies and disclosures between sisters that would normally have been exchanged in a valid marital relationship between petitioner and the deceased. Mary Genik testified that the very first time she knew her sister was claiming to be a common law wife of the decedent was after his death. The record discloses that none of the witnesses called by petitioner testified as to any understanding or belief existing among the mutual friends, neighbors or acquaintances with whom petitioner and the deceased associated in their daily lives that they lived together as husband and wife. Some of petitioner's witnesses testified as to their own beliefs, and some of them as to the understanding among their own acquaintances, but none attempted to show any understanding among friends, neighbors or acquaintances of Mrs. Holding and Galen. Numerous witnesses called on behalf of the respondent established the existence of an understanding or belief in the community among the mutual friends, neighbors and acquaintances of the parties that the relationship of man and wife did not exist—that the deceased had the general and uniform reputation in the community of being a confirmed bachelor.

It is generally held that the reputation must be uniform and general and not limited to particular persons or divided, in the community in which the parties cohabit, in order to give rise to a presumption of marriage. 35 American Jurispurdence, Marriage, section 222, page 330; Klipfel v. Klipfel, supra.

There was introduced in evidence herein on petitioner's behalf a letter purportedly written under date of December 12, 1950 by the deceased to Credit Service, Inc. wherein a credit report on deceased is requested to be prepared and sent to the Mayo Clinic, and it is stated—"My salary is $500 per month, and I own no real estate, only a car and moderate savings. My wife has a beauty shop operated under her business name of Anne Holding, although it pays very little." Five dollars in cash was stated to be enclosed therein. Handwriting experts were employed by both sides, and testified in direct conflict with each other. The petitioner's expert testified that the signature was that of the deceased. The respondent's expert testified that it was spurious. It was admitted, however, that the typewriter used in typing such letter was not the one belonging to the deceased and ordinarily used in his office, and that the pen was not the one ordinarily and customarily used by the deceased. The record and files in this estate establish that the statement "I

own no real estate" was an untruth, because the deceased owned considerable and valuable real estate. His savings were sizable, rather than moderate. He also owned rather valuable stocks. His gross estate exceeded $150,000. He was engaged in the general practice of law, in addition to his employment as city judge.

The court finds from the evidence that the latter was in fact the letter of the decedent and signed by him. However, this letter of the decedent, although it contains the statement "my wife has a beauty shop operated under her business name of Anne Holding, although it pays very little" of itself is insufficient to form a predicate for a finding that a common law marriage existed—in view of all the testimony and evidence submitted in this litigation proving the contrary.

This is especially true where the reason for the writing of the letter in question is so easily ascertainable. The function of the letter was not to acknowledge publicly that she was in fact his wife. The decedent's sole purpose was to try to create an impression at the Mayo Clinic, where he was about to undergo examination and possible treatment, that he was a man of little means, thereby reducing the amount of the bill that would be submitted to him for the services he was about to receive. The contents of the letter clearly establish that fact because almost every statement made in the letter was an untruth. The letter was false almost in its entirety and constituted simply an effort on Galen's part to "cry a poor mouth." Standing alone as the sole positive instance of any reference by the decedent to the petitioner as his wife, it fails to meet the requisite of habit, and repute and acknowledgment required for the establishment of a common law marriage.

It is the finding and conclusion of the court that the petitioner Anne Holding was not the common law wife of Daniel P. Galen, and that no marriage existed between them. The respondent has negated any presumption of marriage, and has sustained the burden of proving that no marriage existed. The weight of the testimony and documentary evidence precludes any finding that a common law marriage existed between the petitioner and the deceased. The preponderence of evidence dictates a conclusion that no marriage in fact existed.

It is accordingly ordered and adjudged that the election to take dower and petition for assignment of dower filed herein by Anne Holding be and they are hereby dismissed with prejudice; and that Anne Holding is not entitled to dower in the estate and property of Daniel P. Galen, deceased; and that the costs reasonably incurred in connection with this matter and controversy be taxed against the petitioner, Anne Holding, upon further order of court.